UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

03 JAN 21 PM 4:29

**DIMAS BARELA,**

    **Plaintiff,**

                             **CIV 01-1354 BB/DJS**

**CITY OF ALBUQUERQUE, et.al,**

    **Defendants.**

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff submits the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1.      Plaintiff (Barela) and his companion, John Garcia were arrested at approximately 1:05 PM on December 11, 2000. (Defendant City of Albuquerque's (City's) Admission number 1.)Ex. 33. They were charged with patronizing a prostitute. The charge is a petty misdemeanor. They encountered the police decoy at point "A" on exhibit 1; they were arrested at point "B", Ex. 1.

2.      Neither Plaintiff nor the defendants know the identity of the officers who arrested Barela and Garcia.

3.      Barela was placed in steel handcuffs immediately upon being arrested, by one of these unknown officers.

4.   After being placed in the steel handcuffs, he was transported to the staging area, behind the Caravan East, and arrived there at approximately 1:15 PM.



1

5.          When he arrived at the staging area, the steel handcuffs were removed and Defendant Simmons replaced them with plastic flex-cuffs, and then conducted a personal property inventory, which he completed at approximately 1:34 PM . Barela told Simmons the flex cuffs were too tight and painful to his arms and shoulders, and too tight around his wrists. Barela depo at 74, ln 23-25, pg 75  lns 1,2

6.          Simmons handcuffed Barela with two single loop plastic cuffs, interlocked together, without providing any space between Barela's hands. His hands were positioned such that the backs of his hands were touching, with his palms out, and thumbs down.

7.          Both the A.P.D. academy training manual Ex. 31 and the Monadnock (manufacturer's) product insert Ex. 30 recommend that when using single loop cuffs, a prisoner's wrists should be crossed and the flex cuff applied across both wrists.

8.          Interlocking two sets of handcuffs is an  approved method of applying hand restraints to persons who may present a flexibility problem , or, due to build, cannot easily reach their hands behind their backs, in that it provides more space between the prisioners hands, and more relief to the prisoner arms and shoulders and is less likely to cause injury.

9.          When placing Barela in these hand restraints, Barela asked Simmons to use two sets of interlocking handcuffs, but Simmons refused.

10.         When placing Barela in the cuffs, Simmons did not check the clearance between the cuffs and Barela's wrists, contrary to his Police Academy training. Had he done so, he would have realized that he had applied the cuffs too tightly, and that

he needed to remove and replace them, to allow for clearance between the cuffs and Barela's wrists.

11.      Flex cuffs have to be applied with more care than steel handcuffs as they cannot be loosened after they are applied.  They are also likely to cause injury if applied too tightly.

12.      Defendant Simmons incorrectly applied the flex cuffs on Barela, in that he did not cross Barela's wrists behind his back, did not leave any clearance between the cuffs and Barela's wrists and did not leave any room between Barela's hands.

13.      Each of these incorrect applications of handcuffs can forseeably cause an injury to the prisoner.

14.      Simmons then, also, conducted personal property inventories of the three other prisoners in his custody, John Garcia (at 1:24), Michael Winchell, (at 1:43) and Victor Otero (at 1:48).

15.      These four prisoners were all held at the staging area, and were all placed in a locked APD transport van by 1:50 PM.  Barela depo, pg 77, lns 13-15; Winchell depo, at page 39, lns 17 – 20.

16.      Barela's arms started tingling almost immediately after being placed in the flex cuffs, and within ten minutes started hurting. Barela depo. at pg 76, ln 20-23

17.      Barela persisted in complaining vociferously about being in pain throughout the time he remained handcuffed in the police van. Winchell, depo at page;  Garcia 29, ln 23 –30,ln 2

18.      While in the van, Barela complained to Simmons about being in pain at least three or four times. Barela depo at 78, ln 5;  At one point, an unidentified officer

3

told Barela the cuffs were indeed too tight, and said he would change out the flex cuffs, but then told Barela he couldn't find any scissors to cut them with.

19.        Throughout the entire encounter with the APD officers, both at the scene of his arrest and at the staging area, Barela was compliant; he passively allowed himself to handcuffed, never struggled, attempted to flee, or evade arrest or capture. He did not move or wiggle his hands around while being handcuffed on either occasion. He never presented a risk to any officer or any other person. See Request for Admissions Nos, 15.

20.        Between 1:15 and the time the cuffs were eventually removed at the jail, at either 3:34 or 4:34 P.M., Barela remained in these restraints.

21.        While at the staging area, Simmons and other APD officers stood around visiting with each other; at one point a pizza was delivered, and consumed by the officers.  This time passed otherwise uneventfully, expect for Barela's complaining that he was in pain, and pleading for relief.

22.        During this same period of time, no other prisoners were taken to the staging area or placed in the van.

23.        APD SOP 2-19-6 B provides, in pertinent part: "transportation of prisoners shall be made without delay" Ex. 32.

24.        The decision when to transport the four prisoners to BCDC was Simmons'; his supervisor, Defendant McWethy, did not give Simmons any more specific instructions about the timing of the runs to BCDC than ..."the van is [to] consistently [be] running back and forth to the ...[jail]"..."its never at the staging area longer than it takes to loan it up and get down [to the jail]". McWethy

4

deposition, page 16, lines 18, 19; page 29, lines 16, 17.

25.     Simmons failed to identify any exigent circumstances to justify the delay in transporting the prisoners to BCDC.

26.     The delay between Barela's being handcuffed and transported to BCDC was a due to a decision made by Simmons to stay at the staging area one or two hours longer than necessary.

27.     A reasonable police officer should have known that Barela was handcuffed too tight, and that they were improperly applied.

28.     A reasonable police officer should have known that keeping prisoners handcuffed for two or three hours, without exigent circumstances justifying it, was unreasonable.

29.     A reasonable police officer, upon being advised by a prisoner that he was in pain, should have made an effort to loosen or replace the cuffs, or otherwise take action to relieve his prisoner's pain.

30.     Injuries from handcuffs being incorrectly applied, being too tight, or applied for too long, are foreseeable, and a reasonable police officer should use reasonable and ordinary care in using handcuffs, making efforts to ensure that a prisoner in his custody does not suffer unreasonable or unnecessary injury.

31.     McWethy did not know the transport van was parked at the staging area for over an hour, with four prisoners inside it, one (Barela) complaining of being in pain. Had he known, he would have advised Simmons to "take the prisoners down to booking". McWethy deposition, at page 32, line 22, 23.

32.      Once Plaintiff arrived at BCDC, Simmons removed the flex cuffs, and replaced them with a double set, interlocking them. See, BCDC booking video, at 1634- 1636 hrs. Simmons depo at pg 19, line 25- pg 20 ln 6.

33.      Simmons "assumed" the reason he took Plaintiff out of the single cuffs and replaced them with looser fitting double cuffs was because Barela had been complaining to him about the handcuffs. Simmons deposition, pages 21, lns 2- 3, 11- 15.

34.      The flex cuffs were removed and then were replaced "a minute or two before [Barela and Simmons] went to medical for an intake screening". Id, lns 5-6

35.      Barela was seen by a BCDC paramedic, Michael Trujillo, who examined him and completed a medical intake form, at 1650 hours. Ex. 22.

36.      Barela was released at approximately 3:00 AM, on December 12, 2000 and was driven to his home, in Mountainair, by John Garcia's wife.

37.      His hands were dark red and maroon when he was released from jail; they were painful and tingling. Barela depo at 85, ln 25, 86, ln 1. Barela did not go to work on December 12th.

38.      On December 13, 2000, Barela saw Dr. Linda Strogner, at Hope Medical Center in Estancia, NM. He complained to her that his hands were numb; he reported that he had been arrested, that the police had put "Zip ties" on his wrists, "they were so tight [sic] hands were blue". Dr Strogner observed little or no sensation to pin prick, bilaterally, little or no strength and diagnosed parasthesia and suggested he see a hand specialist. Ex. 24.

39.     Barela saw David Bernstein, an orthopedist, first on January 4, 2001, and then throughout the spring and summer of 2001, for left wrist and elbow pain, right wrist pain and right shoulder pain. Dr. Bernstein concluded, after several tests performed by Dr. Radecki, including an EMG and bone scan, (which were positive for nerve damage) in the late spring of 2001 that Barela would need surgery, initially on his left elbow, (ulnar nerve) to relieve the pain. Exs. 25,26.

40.     Barela, after his July 9, 2001 examination by Dr. Bernstein, only then consulted with an attorney, and was referred by counsel to George Swajian, D.O., for a second opinion, and a forensic consult, in the fall of 2001. Dr. Swajian concurred that surgery would probably be the only possible hope of relieving Barela's pain, and hopefully allow him to eventually return to work as a journeyman plumber.

41.     Dr. George Swajian is an orthopedic surgeon with sufficient skill, training, education and experience to qualify as an expert witness is orthopedic injuries and related causation. Ex. 27-1.

42.     It is Dr Swajian's opinion that, to a reasonable degree of medical certainty, Barela's right wrist was injured as a proximate result of the handcuffing restraint inflicted by Simmons on December 11, 2000.

43.     Dr. Swajian also opines that to a reasonable degree of medical certainty, Barela's left arm injury, and the medical services required, including the ulnar nerve transposition surgery, eventually performed by Dr. Bernstein in September 2002, was proximately caused by the restraint by Simmons on December 11, 2000; he further observes that the medical literature in the field recognizes a stretching injury, such as

7

Barela reports, could cause such an injury.

44.     Dr. Swajian also opines that to a reasonable degree of medical certainty,
Barela's right shoulder injury was proximately caused by the restraint by Simmons on
December 11, 2000.

45.     Drs. Swajian and Bernstein both opine that although Barela had sustained
a prior injury to his left wrist in 1994, it was not a contributing factor to the pain or
impairment he has experienced since the December 11, 2000 incident.

46.     Dr. Swajian believes to a reasonable medical probability that Barela will
need surgery on his right wrist and his right shoulder in the future, and estimates the
costs of these additional surgeries to be approximately $17,000.00.  Dr. Bernstein is
expected to perform a right wrist fusion during 2003.  No date has been scheduled for
the right shoulder surgery.

47.     Dr Barry Diskant is an orthopedic surgeon with sufficient skill, training,
education and experience to qualify as an expert witness in orthopedic injuries and
related causes. Dr. Diskant preformed an Independent Medical Examination of
Barela, on August 14, 2002.

48.     Dr. Diskant opines that Barela's right wrist injury was, to a reasonable
degree of medical certainty, the result of "his prolonged immobilization with zip-tie
handcuffs on 12-11-00".

49.     Dr. Diskant opines that the left arm injury was possibly caused by the
restraint, but cannot state so to a reasonable degree of medical certainty, because,
since Barela did not report any blow or impact to his left arm, and Dr Diskant
observed that "the most common cause of ulnar neuropathy is direct trauma to the

elbow", Barela's history is inconsistent with this finding. Dr. Diskant opines however the ulnar nerve transposition is appropriate treatment for this type of injury.

50.        Dr. Diskant opines that Barela's right shoulder injury pre-existed the December 11, 2000 incident; however, he continues, it is possible that the incident aggravated a pre-existing condition.

51.        Ken Williams has sufficient education, training, experience and knowledge to qualify as an expert and to offer expert opinions in the field of vocational disabilities, including vocational impairment and rehabilitation, the earning potentials of different vocations, and the effect of disability on earning potential. Ex. 29-1.

52.        On April 22, 2002, Mr. Williams characterized Barela as having a "significant" vocational disability, due to the injuries he sustained on December 11, 2000, and the resulting physical impairments he has with regard to the use of his hands and arms, caused by those injuries.  He also opines that Barela now is "at or below the 10th percentile in motor coordination, finger and manual dexterity, and gross manual function". Ex. 29.

53.        Mr. Williams found that prior to the December 11, 2000 incident, Barela, who was a journeyman plumber had access to 36.4% of jobs in the New Mexico labor market. After the incident, and the resulting injuries, he has access to only 1.3% of jobs in the same market, representing an 85% loss of access to the job market. This diminution of access to the job market is causally related to his physical impairments.

54.        Presently, Barela is unable to perform work as a plumber due to his ongoing and unresolved medical impairments, and is working at menial, minimum

wage jobs.

55.　　　Despite his physical impairments and depression, he has made reasonable efforts to find and maintain employment.

56.　　　There is no basis to assume he will ever return to work as a journeyman plumber, and to do so would be speculative.

57.　　　There are at least two acceptable methods to determine lost earnings and lost earning potential. The first is to look at historical earnings before and after the injury. In doing so, a review of Barela's historical adjusted gross earnings for the years 1996 through 2001, based on authentic Internal Affairs transcripts, indicate as follows:

```
1996..............$25,959.00
1997..............29,970.00
1998..............18,363.00
1999..............34,200.00
2000..............17,242.00
2001.................3,006.00
```
Ex. 39.

58.　　　Barela's average gross adjusted income for the years 1996 through 2000 was $25,146.00. His income for 2001 and 2002, the years subsequent to his injury was $22,000 less. Projecting this forward for the remainder of his work life (thirty years), indicates he will suffer a loss of future earnings of $660,000.00.

59.　　　A second method to determine lost future earnings is to look at changes in potential earning capacity, based on schedules, relied on and extrapolated by Mr. Williams. According to Mr. Williams, prior to the December 11, 2000 incident, Barela's average earning capacity was $13.71 per hour. Currently it is $7.46. Ex. 29.

60.　　　This represents an earning capacity loss of $6.49/hr, which will persist

until Barela retires from the work force in 32 years, or at the age of 64.

61.        An average work year is 2000 hours.  Barela will experience this wage

loss for 64,000 hours, which is equivalent to a loss of $415,360.00 in income, without

even taking into account any rates of inflation.

62.        The court takes judicial notice of generally accepted rates of discounting

projected damages to a present value.  These rates are within a range of 6%, and the

economic losses calculated in paragraphs 55 and/or 58, above, should be discounted

by a value at 6%.

63.        Barela's total medical bills for services necessitated by the December 11,

2000 incident are $_____.  His projected future medical costs are in a range of

$17,000.00

64.        Barela has suffered significant, persistent and almost daily pain and

suffering since December 11, 2000, proximately caused by the December 11, 2000,

incident.

65.        Barela has suffered a significant emotional injury, including depression, as

a proximate result of the December 11, 2000 incident.

## CONCLUSIONS OF LAW

Liability under 42 USC Section 1983

1.        Claims for excessive force are analyzed under a Fourth Amendment,

reasonableness, standard.  *Graham v. Connor,  , 490 U.S. 386, 394, 104 L. Ed. 2d 443,*

*109 S. Ct. 1865 (1989). "Graham* clearly establishes the general proposition

that use of force is contrary to the Fourth Amendment if it is excessive under objective

standards of reasonableness". *Saucier v Katz*, 533 U.S. 194; 121 S. Ct. 2151; 150 L. Ed. 2d 272 (2001).

2.　　　　The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. *Graham v. Connor, 490 U.S. 386, 394, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989).*

3.　　　　The use of handcuffs in an unreasonable manner is an excessive use of force. *Martin vs. Heideman,* 106 F.3d 1308 *(6th Cir 1997)*, and cases cited therein; and something Defendant Simmons knew or should have known about.

"No reasonable officer could believe that the abusive application of handcuffs was Constitutional" *Palmer v. Sanderson*, 9 F.3d 1433; (9th Cir. 1993). See also, *Lusby v. T.G.& Y. Stores, Inc.,* 749 f.2D 1423 (10th Cir. 1984):

4.　　　　*Graham* sets out a set of criteria through which to analyze an excessive force claim:

> These are: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."…

5.　　　　*Graham* also recognizes the need for deference for decisions made by police officers under stressful conditions:

> … The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.

6.　　　　Under a *Graham* analysis, these elements weigh in favor of Barela: The crime he was charged with was a petty midemeanor; He posed no threat to the officers or others, rather he was fully compliant while being handcuffed, and for the duration of his prolonged restraint, he was locked in the back of a small police van.

Finally, he neither resisted nor attempted to flee.

7.          There were no exigent circumstances present to justify the conduct of
Defendant Simmons ' refusal to adjust the handcuffs, nor for his restraining Barela for
such a prolonged period of time.

8.          Defendant Simmons conduct was unreasonable and violated Barela's
constitutional rights to be free from excessive force.

9.          Barela is entitled to compensation under 42 USC Section 1983

10.         He is also entitled to an award of attorney's fees and costs.

11.         Simmons conduct was willful and deliberately indifferent to Barela's
complaints of pain, thus justifying an award of punitive damages, for the purpose of
punishing his conduct, and deterring others from similar conduct.

          Liability under New Mexico Tort Claims Act (TCA)

12.         The New Mexico Tort Claims Act recognizes that Simmons had a duty
to exercise reasonable and ordinary care while Barela was in his custody to prevent
Barela from suffering an injurious battery. *Methola v County of Eddy,*  95 N.M. 329;
622 P.2d 234 (1980).

13.         A battery is a non-consensual physical contact, or in this case, that
physical restraint that went beyond what was reasonable and prudent, given the
circumstances.

14.         The standard of care for police offices under the New Mexico Tort Claims
Act is:

     "a failure to act, to be negligent, must be a failure to do an act which a
reasonably prudent and qualified law enforcement officer, in the exercise of ordinary
care, would do in order to prevent injury to a person whom the officer would foresee to

be exposed to risk of injury. As the risk of danger that reasonably should be foreseen increases, the amount of care required also increases. If, without negligence on his part, the officer is suddenly and unexpectedly confronted with peril and does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by any reasonably prudent and qualified officer under the same conditions, then he has done all that the law requires of him, even though, in the light of afterevents, it might appear that a different course would have been better and safer. This statement of the law appears clear enough from Uniform Jury Instructions, SCRA 1986, 13-1601, 1603 and 1617."

*Cross v City of Clovis*, 107 N.M. 251; 755 P.2d 589; 1988

15.     Although Simmons may have been initially justified in detaining and placing Barela in restraints, he is liable for any subsequent injury inflicted on Barela, even if caused due to negligence. *Blea, id.*

16.     "[W]hen one party is in the custodial care of another, ... the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody." *Methola*, supra.

17.     Simmons's conduct on December 11, 2000 did not meet the standard of reasonable or ordinary care, and he negligently caused Barela to suffer unnecessary physical injury in the course of his handcuffing.

18.     The City of Albuquerque is liable for Simmons' negligence under the doctrine of Respondeat Superior.

DAMAGES

20.     The purpose of compensatory damages is to make Plaintiff whole -- that is, to compensate Plaintiff for the damages he has suffered. Compensatory damages are not restricted to actual loss of time or money that Plaintiff may have incurred because of his injury. They cover both the mental and physical aspects of injury - tangible and intangible. He is entitled to compensatory damages for pain and suffering, mental anguish, and shock and discomfort that he has suffered because of Defendant Simmons' conduct. No evidence

of the monetary value of such intangible things as pain and suffering or mental anguish has been, or need be, introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award made should be fair in light of the evidence presented at trial.

Compensatory damages may only be awarded for injuries that Plaintiff proves were proximately caused by Defendant's allegedly wrongful conduct. The damages awarded must be fair compensation for all of Plaintiff's damages, no more and no less. Damages should not be awarded for speculative injuries, but only for those injuries which Plaintiff has actually suffered or that Plaintiff is reasonably likely to suffer in the future.

An award compensatory damages should be guided by dispassionate common sense. Computing damages may be difficult, but the law does not require that Plaintiffs prove the amount of their losses with mathematical precision, but only with as much definiteness and accuracy that the circumstances permit.

Sound discretion in fixing an award of damages, and drawing reasonable inferences where appropriate from the facts and circumstances in evidence as sufficient to determine compensatory damages.

The following elements of damages, to the extent proven by a preponderance of evidence are allowable:

A.     Any personal humiliation and embarrassment suffered by the Plaintiff;

B.     Any bodily injury sustained by the Plaintiff and any resulting pain, suffering, and mental anguish experienced in the past or to be experienced in the future;

C.     Any mental or emotional distress suffered by Plaintiff, that is not a result of any physical injury, but is a result of the deprivation of Plaintiff's rights; and

15

D.    Costs of any medical treatment Plaintiff necessarily or reasonably obtained because of the incidents in question.

E.    Any loss of income or loss of earning potential

Freeman, et al., vs. Acosta, et al., CV 96-1516 BB/JHG(instruction given)(modified) Pattern Jury Instructions, Civil Cases, Eleventh Circuit, (West's 1990)

21.    The court may take judicial notice of mathematical calculations in determining damages, and may take judicial notice of rates used to reduce future damages to a present value. In Re *Eagle Pitcher Industries,* 189 B.R. 681 (S.D. Ohio 1995); *Besse vs. Burlington Northern,* 79 F.R.D. 623, 628 (D. Minn. 1978)

PUNITIVE DAMAGES

22.    Since compensatory damages are to be awarded on the federal civil rights claims, punitive damage against the Defendant are also appropriate. The function of punitive damages is to punish the Defendant for malicious or bad faith conduct, and to deter similar conduct by others.  A decision whether to award punitive damages should be based on whether the conduct of Defendant Simmons demonstrated one or more of the following:

1.    Violations of the Plaintiff's rights when done maliciously, wantonly or oppressively.

2.    Intentional acts by Defendants with callous, or deliberate disregard, or indifference to the Plaintiff's constitutional rights.

3.    Reckless disregard by Defendants as to whether they were violating Plaintiff's rights.

An award of punitive damages must take into consideration the character and degree of the wrong and the necessity of preventing similar wrongs.   Any award must be

16

reasonably related to the wrong and necessary to deter Defendant Simmons and others from engaging in similar conduct.

If it is found that Defendant Simmons did any one of these things, and if it is also found that justice and the public good require it, punitive damages may be awarded.

N.M. UJI CIV 13-1827 (Modified)
City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)
Smith v. Wade, 461 U.S. 30 (1983)
Silver v. Cormier, 529 F.2d 161, 163 (10th Cir. 1976)
Atencio v. City of Albuquerque, 911 F.Supp. 1433, 1446-47 (D.N.M. 1995)


## 22. PUNITIVE DAMAGES/MALICE DEFINED

An act or failure to act is "maliciously" done if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups of categories of which the injured person is a member.

An act or failure to act is "wantonly" done if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.

An act or failure to act is "oppressively" done if done in a way or manner which injures, damages or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power or by taking advantage of some weakness, or disability, or misfortune of another person.

An act or failure to act is one with "reckless disregard" if done in callous disregard of or indifference to the rights of one or more persons, including the injured person.

Federal Jury Practice and Instructions, Sec. 85.19 (West's 1977)
Doe v. New York City Department of Social Services, 649 F.2d 134, 142-44 (2d Cir. 1981)

VERDICT

The court finds that Plaintiffs constitutional rights were violated, and finds that

Plaintiff is entitled to an award of compensatory damages in the sum of  $_____.___.

The court further finds that Plaintiff is entitled to an award of punitive damages in

the sum of $_____.___

Respectfully submitted,

David L. Plotsky
122 Girard S.E.
Albuquerque, New Mexico 87106
(505) 268-0095

I hereby certify that a true
and correct copy of the
foregoing pleading was
mailed to Jeffrey Baker, Esq.
this  21  day of January, 2003.

David L. Plotsky

## APPENDIX 1

TIME LINE

1:00 Winchell arrested at Bow and Arrow
1:05 Barela and Garcia arrested on Central, app. 1 mile E of Bow and Arrow
1:14 Winchell's car towed
1:15 Otero arrested at Bow and Arrow
1:21 Barela's car towed from Central
1:24 Garcia personal property inventoried by Simmons
1:34 Barela personal property inventoried by Simmons
1:43 Winchell personal property inventoried by Simmons
1:48 Otero personal property inventoried by Simmons

3:34 Barela pre-booking form stamped at BCDC
3:34 Garcia pre-booking form stamped at BCDC
3:34 Winchell pre-booking form stamped at BCDC
3:34 Otero pre-booking form stamped at BCDC
3:35 Barela's criminal complaint stamped at BCDC

4:00 Barela's release order signed, time hand written in at BCDC
4:00 Garcia's release order signed, time hand written in at BCDC
4:00 Otero's release order signed, time hand written in at BCDC
4:00 Winchell release order signed, time hand written in at BCDC
4:34 Barela's handcuffs removed at BC DC by Simmons
4:50 Barela's medical intake form filled out
5:28 Winchell's property receipt time typed
5:33 Winchell's booking sheet time typed
5:50 Winchell's release form completed
5:55 Garcia's booking sheet time typed
6:02 Barela's property receipt time typed
6:04 Barela's arrival time on inmate history indicated
6:08 Otero property receipt time typed
6:12 Barela offender booking sheet time typed
6:13 Otero offender booking sheet time typed
8:35 Barela release order form completed
8:35 Garcia release order form completed
8:35 Otero release order form completed