IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED

03 FEB 14 PM 4: 16

DIMAS BARELA,

    Plaintiff,

vs.    No. CIV-01-1354-BB/DJS

CITY OF ALBUQUERQUE,
E.J. BALAND, ROB SIMMONS,
and MATTHEW McWETHY,

    Defendants.

### DEFENDANT SIMMONS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Following the trial of this matter, but before Judgment is entered, Defendant Simmons hereby submits supplemental proposed Findings of Fact and Conclusions of Law.

### INTRODUCTION

The Court entered summary judgment for Defendant Beth Baland (doc #83). Plaintiff voluntarily dismissed with prejudice his claims against Defendant Matthew McWethy (doc #106). Plaintiff voluntarily dismissed without prejudice his claims against the City of Albuquerque (filed in open court during Pre-Trial Conference on January 29, 2003). The only remaining Defendant is Albuquerque police officer Robert Simmons.

### SUPPLEMENTAL FINDINGS OF FACT

**John Garcia**

1. John Garcia was Dimas Barela's co-worker at Mountain Valley Mechanical. [John Garcia deposition p. 5 - 6]

1



2. John Garcia was a passenger in Dimas Barela's car, and was arrested with him on December 11, 2000. [John Garcia deposition, p. 10]

3. The police officer who eventually drove the transport van was the same officer who placed plastic handcuffs on John Garcia at the staging area. [John Garcia deposition p. 31]

4. Albuquerque police officer Robert Simmons drove the transport van (Simmons trial testimony).

5. At the staging area at the Caravan East, John Garcia was handcuffed with plastic handcuffs, with his hands behind his back, with his thumbs touching, with his palms facing up, and with his hands below his belt line. [John Garcia deposition p. 19 - 20]

6. John Garcia's plastic handcuffs "felt fine" while he was in the police van, except for the fact he has long arms and there was not much room in the transport van. [John Garcia deposition p. 27]

7. John Garcia was allowed to use the restroom at the Caravan East. [John Garcia deposition p. 21 - 22]

8. When John Garcia used the bathroom at the Caravan East, his plastic handcuffs were cut off. [John Garcia deposition p. 24 - 25] After using the bathroom, he was re-cuffed in the same manner as before [John Garcia deposition p. 25]

9. According to John Garcia, Dimas Barela did not have a conversation with any police officer about his handcuffs. [John Garcia deposition p. 32]

10. There was a wire grille divider running down the center of the transport van. [John Garcia deposition p. 27; McWethy trial testimony]

11. According to John Garcia (and contrary to what Michael Winchell said in his

deposition), Dimas Barela did not kick the van. [John Garcia deposition p. 32]

12. According to John Garcia (and contrary to what Michael Winchell said in his deposition), Dimas Barela did not knock his shoulder or back or body into the side of the van. [John Garcia deposition p. 32]

13. According to John Garcia (and contrary to what Michael Winchell said in his deposition), there was not enough room inside the van for someone to kick the van, or to knock their shoulder, back or body into the side of the van. [John Garcia deposition p. 32]

14. According to John Garcia (and contrary to what Michael Winchell said in his deposition), no one inside the van was able to stand up. [John Garcia deposition p. 33]

15. According to John Garcia (and contrary to what Michael Winchell said in his deposition), no one inside the van was jumping up and down. [John Garcia deposition p. 34]

16. According to Michael Winchell, the driver of the transport van "was a little more professional" than the other officers. [Winchell deposition p. 34]

**Robert Simmons**

17. Robert Simmons did not become a Defendant in this case until the filing of the Second Amended Complaint on July 9, 2002, nineteen months after the incident. (doc #53)

18. Robert Simmons does not recall Dimas Barela, and does not recall handcuffing him. (Simmons trial testimony)

19. Robert Simmons' standard method of handcuffing a person who is not struggling is to have the person place his hands and arms behind his back, thumbs touching, palms up, with the hands below the belt line. Simmons then tells the person to keep his palms up, or place his palms facing each other, whichever is more comfortable. (Simmons trial testimony)

20. Robert Simmons saw "single loop" plastic cuffs at the Police Academy, but has never seen "single loop" plastic cuffs in the field. (Simmons trial testimony)

21. On December 11, 2000 there were no "single loop" plastic cuffs being used in the "John Operation," only "double loop" plastic cuffs. (Simmons trial testimony; McWethy trial testimony)

## Left Ulnar Neuropathy (Cubital Tunnel Syndrome)

22. When Dimas Barela walked into the Bernalillo County Detention Center at approximately 3:30 p.m. on December 11, 2000, his hands were behind his back, in plastic restraints. His forearms were at approximately a 45 degree angle from his upper arms, and his hands were below his belt line. (BCDC videotape).

23. According to Barry Diskant, M.D., holding the forearms in a "varus" position (elbows out, forearms and hands pointing towards the center of the body) places no stress on the ulnar nerve, as opposed to holding the forearms in a "valgus" position (elbows in). (Barry Diskant, M.D. trial testimony).

24. When Dimas Barela walked into the Bernalillo County Detention Center, his forearms and elbows were in a "varus" orientation. (BCDC video, see 16:29:54 for position of Plaintiff's arms when he first walks into the jail).

25. According to Barry Diskant, M.D., ulnar neuropathy (also referred to as cubital tunnel syndrome) is almost always caused by direct trauma to the elbow (Dr. Diskant trial testimony; MEC report, Defendant's trial exhibit Q).

26. Dimas Barela testified no police officer struck or touched his elbow. (Dimas Barela trial testimony).

4

27. On extreme elbow flexion (i.e., 130 degrees), the ulnar nerve is stretched tightly around the bony medial epicondyle. When the elbow is flexed to 90 degrees and beyond, the space within the cubital tunnel decreases, putting some pressure on the ulnar nerve. Dr. Diskant searched the medical literature, and could find no reported cases of ulnar neuropathy (or cubital tunnel syndrome) where the elbow was flexed less than 90 degrees. Plaintiff's arms were flexed approximately 45 degrees. (Dr. Diskant trial testimony; Dr. Diskant's supplemental report, Defendant's exhibit NN; BCDC video).

28. Dr. George Swajian, D.O. wrote in his expert report that pressure can be placed on the ulnar nerve when a person is lifted by the handcuffs and this could explain how Plaintiff's ulnar nerve problem developed. (Dr. Swajian's trial testimony). However, Dimas Barela testified he was never lifted by his handcuffs. (Dimas Barela trial testimony)

29. David Bernstein, M.D., the treating surgeon, offered no opinion about what caused Plaintiff's left ulnar neuropathy (cubital tunnel syndrome). (Dr. Bernstein trial testimony).

**Right Shoulder**

30. Barry Diskant and the members of the IME panel concluded that Plaintiff's right shoulder impingement pre-existed December 11, 2000 and was not caused by the handcuffing. The panel indicated that it was <u>possible, not probable</u>, that the handcuffing aggravated a pre-existing shoulder condition. (Dr. Diskant trial testimony; MEC report, Defendant's exhibit Q).

31. The doctors on the IME panel, plus Dr. Bernstein, the treating surgeon, all agree Plaintiff has a type II - III cromial morphology to the right shoulder, which is something Plaintiff was born with. The x-rays of Plaintiff's right shoulder indicate degenerative arthritis in the right shoulder. Dr. Diskant reviewed the medical literature, and could not find anything which suggested

5

a relationship between extension and internal rotation of the shoulder as a risk factor for development or aggravation of shoulder impingement. (Dr. Diskant trial testimony; Dr. Diskant's supplemental report, Defendant's exhibit NN).

32. Plaintiff did not mention to Dr. Bernstein, his treating surgeon, a problem with his right shoulder until August, 2001, which was nine months following his arrest. (Dr. Bernstein trial testimony).

### Right Median Neuropathy and Wrist Pain

33. Plaintiff was examined by Prison Health Services paramedic Michael Trujillo at the jail at approximately 3:50 p.m., about 15 minutes after Defendant Simmons removed the plastic restraints and replaced them with metal handcuffs (Michael Trujillo trial testimony; BCDC video; "BCDC Timeline").

34. Plaintiff did not complain to paramedic Michael Trujillo about his hands, wrists, or any other part of his body (Michael Trujillo trial testimony; Medical Intake Form, Defendant's exhibits K & L).

35  Contrary to Plaintiff's trial testimony, paramedic Michael Trujillo took vital signs, including Plaintiff's blood pressure, pulse, and resting respirations (paramedic Michael Trujillo's trial testimony; Defendant's exhibit K).

36. Paramedic Michael Trujillo observed no sign of trauma or injury to Plaintiff's hands, wrists, or any other part of his body (paramedic Michael Trujillo's trial testimony; Defendant's exhibits K & L).

37. Following the paramedic exam, and after the Inmate Intake Form was completed by paramedic Michael Trujillo, Plaintiff signed the Inmate Intake Form (Plaintiff's exhibits 10 and 11;

Defendant's exhibit MM [original medical file]).

38. Dr. Bernstein, Plaintiff's treating surgeon, never diagnosed carpal tunnel syndrome (a nerve injury) to Plaintiff's right wrist (Dr. Bernstein trial testimony).

39. Dr. Bernstein, Plaintiff's treating surgeon, never treated Plaintiff for carpal tunnel syndrome (Dr. Bernstein trial testimony).

40. EMG nerve studies of Plaintiff's right wrist have all been negative (Dr. Bernstein trial testimony; Dr. Diskant trial testimony).

41. Dr. Bernstein, Plaintiff's treating surgeon, diagnosed Plaintiff's right wrist problem as arthritis in the right carpal bones. An MRI of the right wrist dated 11/27/02 showed degenerative changes of the capitate and lunate bones with multiple cysts. (Dr. Bernstein trial testimony).

42. Although handcuffs which are too tight at the wrist can cause radial nerve compression, Plaintiff does not suffer from a radial nerve injury (Dr. Bernstein trial testimony; Dr. Diskant trial testimony).

43. Dr. Bernstein offered no opinion about the cause of the degenerative changes to the capitate and lunate bones with multiple cysts (Dr. Bernstein trial testimony).

44. Dr. Diskant concluded that Plaintiff's continued right wrist pain is caused by degenerative arthritis, which was not caused by the handcuffing (Dr. Diskant trial testimony; Dr. Diskant's supplemental report, Defendant's exhibit NN).

**Samuel Roll, Ph. D.**

45. Plaintiff scored abnormally high on the "Lie scale" on the MMPI. This means he is unable to admit responsibility for his own failings, even when they are minor. (Dr. Roll trial testimony; Dr. Roll report, Defendant's exhibit R).

46. Plaintiff scored high on the symptom magnification "F scale" of the MMPI. (Dr. Roll trial testimony; Dr. Roll report, Defendant's exhibit R)

47. Plaintiff is consciously or unconsciously exaggerating or malingering (Dr. Roll's trial testimony; Dr. Roll report, Defendant's exhibit R).

48. Because there are no broad discrepancies between sub-scale scores on the Wechsler Adult Intelligence Scale III (WAIS) test which Plaintiff took, and because of the results of the Rorschach and Thematic Apperception Tests, there is no evidence to support a diagnosis of depression or post traumatic stress disorder (Dr. Roll trial testimony; Dr. Roll report, Defendant's exhibit R).

## **Handcuffing**

49. Plaintiff claims he was placed in two "single loop" plastic cuffs (Plaintiff trial testimony). If this is true, this is the equivalent of being "doubled cuffed," which is what Plaintiff claims he was asking the police officers to do.

50. Plaintiff was arrested at approximately 1:05 p.m. (APD Incident Report, Defendant's exhibit D).

51. Plaintiff was placed in metal cuffs when he was first arrested (Plaintiff's trial testimony).

52. Plaintiff was transported from the site of his initial arrest to the staging area at the Caravan East (Plaintiff's trial testimony).

53. At the staging area, Plaintiff was placed in a patrol car. (Plaintiff's trial testimony).

54. Plaintiff was searched by officer Robert Simmons at approximately 1:34 p.m. (Plaintiff's trial testimony; Defendant's exhibit F).

55. Plaintiff was placed in plastic restraints at about the same time he was searched (Plaintiff trial testimony).

56. Plaintiff was in plastic restraints from approximately 1:34 p.m. until approximately 3:33 p.m. (Plaintiff's trial testimony; Inventory, Defendant's exhibit F; BCDC video; BCDC timeline).

57. Plaintiff was in plastic restraints for approximately 2 hours, not 4 - 5 hours as Plaintiff told Dr. Bernstein, Dr. Morgan, and others (Dr. Bernstein trial testimony; Dr. Morgan trial testimony).

58. Plaintiff never informed Defendant Simmons, or any other police officer, that he had a pre-existing arthritic condition to his right shoulder or right wrist. (Plaintiff trial testimony)

**Plaintiff's Credibility**

59. Plaintiff was not a credible witness

60. Examples of Plaintiff's lack of credibility include, but are not limited to the following:

    a) denying he signed the Medical Intake Form (Defendant's exhibit K and Defendant's exhibit MM)

    b) denying the paramedic took his vital signs (blood pressure, etc.,) (Defendant's exhibit K)

    c) falsifying a High School Diploma as part of his application to work at Corrections Corporation of America.

    d) offering to pay money to Mary Lucero, owner of Triple L Plumbing, if she and her husband would testify falsely at the trial of this matter.

e)   testifying he stopped working for Swift Transportation Co. because of injuries from being handcuffed, whereas the record from Swift indicates Plaintiff was a temporary driver eligible for re-hire (Defendant's exhibit X, page 50)

f)   answering the health related questions on the Swift Transportation Co. application as if he was healthy and able to perform all the physical demands of the job, yet testifying in court he lied when he answered the health questions (Plaintiff's trial testimony; Defendant's exhibit X, page 82).

61.   There is no credible evidence Plaintiff was placed in handcuffs which caused deep indentations in his wrists.

62.   There is no credible evidence Plaintiff was placed in handcuffs which were too tight.

### SUPPLEMENTAL REQUESTED CONCLUSIONS OF LAW

1.   Plaintiff's handcuffing was not done improperly and did not violate the 4th Amendment.

2.   Plaintiff's handcuffing was not done improperly and did not violate New Mexico state law.

3.   Keeping Plaintiff in a plastic restraint for 2 hours was not unreasonable.

4.   Keeping Plaintiff in a plastic restraint for 2 hours did not violate Plaintiff's rights under the 4th Amendment.

5.   Keeping Plaintiff in a plastic restraint for 2 hours was not a battery under New Mexico state law.

Respectfully submitted,

THE BAKER LAW FIRM

_____
JEFFREY L. BAKER
Attorney for Defendant Simmons
20 First Plaza NW
Suite 402
Albuquerque, New Mexico 87102
(505) 247-1855

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was mailed to Plaintiff's counsel of record, David L. Plotsky, Esq., Plotsky & Dougherty, P.C., 122 Girard SE, Albuquerque, New Mexico on this __14__ day of February 2003.

_____
Jeffrey L. Baker