IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

**DIMAS BARELA,**

    **Plaintiff,**

**v.**    No. CIV 01-1354 BB

**ROB SIMMONS,**

    **Defendant.**

COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW

THIS MATTER having come on for a trial to the Court without a jury on February 4 and 5, 2003, and all evidence having been presented, having considered the parties' proposed findings and conclusions, and having reviewed the applicable law, the Court now makes its findings of fact and conclusions of law:

Findings of Fact

1.  Plaintiff is a resident of Torrance County, State of New Mexico.

2.  Officer Rob Simmons was at all times material hereto employed by the City of Albuquerque as a police officer.

3.  On December 11, 2000, Albuquerque Police Department ("APD") officers were conducting a "john" operation, whereby an undercover female police officer posed as a prostitute operating out of the Bow & Arrow Motel.

4.  As part of this operation, APD also maintained a command post staging area at the Caravan East, a night club with a large parking lot, located near the Bow & Arrow Motel.

5.  Persons arrested in the "john" operation would be taken from the arrest point to the staging area, where initial paperwork would be completed and the arrestees' vehicles would be towed.

6.  Plaintiff was arrested at approximately 1:05 PM on December 11, 2000.

7.  Plaintiff was placed in steel handcuffs immediately upon being arrested by unknown officers, and transported to the staging area, arriving there at approximately 1:15 PM.

8.  When he arrived at the staging area, the steel handcuffs were removed and Officer Simmons replaced them with plastic flex-cuffs, and then conducted a personal property inventory, which he completed at approximately 1:34 PM. Flex cuffs have to be applied with more care than steel handcuffs as they cannot be loosened after they are applied.

9.  Plaintiff has an endomorphic body type with very broad shoulders. One of the others arrested, Michael Winchell, described him in the common vernacular as "stocky."

10. Plaintiff told Defendant the flex cuffs were too tight and painful to his arms and shoulders, and too tight around his wrists, and asked to be "double cuffed" (using

two sets of cuffs). Plaintiff was aware of this technique from his prior work as a correctional officer. Nonetheless, Defendant handcuffed Plaintiff without providing sufficient space between Plaintiff's hands. His hands were positioned such that the backs of his hands were touching, with his palms out and thumbs down. This put undue pressure on his shoulders and wrists.

11. When placing Plaintiff in the cuffs, Defendant did not check the clearance between the cuffs and Plaintiff's wrists, contrary to his training at the New Mexico Police Academy. Had he done so, he would have realized that he had applied the cuffs too tightly, and they were likely to cause injury.

12. A reasonable police officer should have known that Plaintiff's cuffs were too tight, and that they were improperly applied.

13. Plaintiff's arms started tingling almost immediately after being placed in the flex cuffs, and within ten minutes his arms and hands started hurting. Mr. Barela's cuffs were tighter than the other detainees and he began yelling for help.

14. Plaintiff persisted in complaining vociferously at least three times to numerous APD officers while he remained handcuffed in the police van. Plaintiff even banged on the van door to get attention.

15. A reasonable police officer, upon being advised by a prisoner that he was in pain, should have made an effort to loosen or replace the cuffs, or otherwise take action to relieve his prisoner's pain.

16. **Throughout the entire encounter with the APD officers, both at the scene of his arrest and at the staging area, Plaintiff was compliant; he passively allowed himself to be handcuffed, never struggled, attempted to flee or evade arrest or capture. He never presented a risk to any officer or any other person.**

17. **While at the staging area, Defendant and other APD officers stood around visiting with each other. When pizza was delivered, everyone engaged in the APD operation stopped for lunch.**

18. **Plaintiff remained in these restraints between approximately 1:15 PM and 3:48 PM when the flex cuffs were eventually removed at the city-county jail.**

19. **Defendant transported Plaintiff and three other arrestees to the Bernalillo County Detention Center ("BCDC"). The booking video shows Plaintiff restless and pacing as though in discomfort.**

20. **Once Plaintiff arrived at BCDC, Defendant removed the tight flex cuffs, and replaced them with a double set, interlocking them as Plaintiff had originally requested.**

21. **The booking video shows Officer Simmons having a great deal of difficulty in getting the shears between the cuffs and Plaintiff's hands.**

22. **Defendant testified he "assumed" the reason he took Plaintiff out of the single cuffs and replaced them with looser fitting double cuffs at the jail was because**

**Plaintiff had been complaining about the handcuffs. After his cuffs were removed, Plaintiff immediately began rubbing his wrists.**

23. **Plaintiff was seen very briefly by a BCDC paramedic, Michael Trujillo, who examined him and completed a medical intake form at 4:50 PM. Plaintiff made no complaint to the paramedic and Trujillo observed no signs of trauma or injury to Plaintiff's wrists, arms or elbows.**

24. **Plaintiff's former wife, Jennifer Barela, testified that Plaintiff's hands were red and swollen when he arrived home early the next morning.**

25. **On December 13, 2000, two days following the arrest, Plaintiff saw Dr. Linda Strogner at Hope Medical Center in Estancia, NM. He complained to her that his hands were numb; he reported that the police had put "zip ties" on his wrists and that "they were so tight [his] hands were blue." Dr Strogner found little or no sensation to the pin prick test, bilaterally, little or no hand strength, and diagnosed parasthesia. Dr. Strogner suggested Plaintiff see a hand specialist.**

26. **On January 4, 2001, Plaintiff saw Dr. David Bernstein, an orthopedist. He returned to Dr. Bernstein throughout the spring and summer of 2001 for left wrist and elbow pain, right wrist pain, and right shoulder pain. After several tests (which were positive for nerve damage) including an EMG and bone scan, Dr. Bernstein concluded that Plaintiff would need surgery. Dr. Bernstein initially performed surgery on Plaintiff's left elbow (ulnar nerve) to relieve the pain.**

27. **Plaintiff was seen by Dr. George Swajian, D.O., for a second opinion and a forensic consult in the fall of 2001. In addition to examining Plaintiff, Dr. Swajian reviewed Dr. Bernstein's medical records.  Dr. Swajian concurred that surgery would offer the only hope for relieving Plaintiff's pain.**

28. **Dr. Swajian is qualified to express opinions as an expert witness in orthopedic injuries and related causation.**

29. **It is Dr Swajian's opinion that to a reasonable degree of medical certainty, Plaintiff's right wrist was injured as a proximate result of Defendant placing handcuffs on Plaintiff on December 11, 2000.  Dr. Swajian also opined that, to a reasonable degree of medical certainty, Plaintiff's left arm injury and the resultant ulnar nerve transposition surgery performed by Dr. Bernstein in September 2002 was proximately caused by the handcuffs affixed by Defendant on December 11, 2000.**

30. **Dr. Swajian also testified that to a reasonable degree of medical certainty, Plaintiff's right shoulder injury was proximately caused by the restraint by Defendant on December 11, 2000, and not pre-existing arthritic changes.**

31. **Drs. Swajian and Bernstein both testified that although Plaintiff had sustained a prior injury to his left wrist in 1994, it was not a contributing factor to the pain or impairment he has experienced since December 11, 2000.**

32. Dr. Swajian believes to a reasonable medical probability that Plaintiff will need surgery on his right wrist and his right shoulder in the future, and estimates the costs of these additional surgeries to be approximately $17,000.00. Dr. Bernstein is expected to perform a right wrist fusion during February 2003. No date has been scheduled for the right shoulder surgery.

33. Plaintiff received Paxil for his depression.

34. Dr Barry Diskant is qualified to express opinions as an expert on the biomechanics of injuries. Along with an orthopaedic specialist, Dr. Ritchie, and a plastic hand surgeon, Dr. Gobeille, Dr. Diskant performed an independent medical examination of Plaintiff on August 14, 2002. They found a positive Tinel's sign indicating numbness in the right wrist. A Phalen's test was not possible because of pain in the right wrist. The August 14, 2002, report of the examination concluded, "It is the opinion of the panel, to a reasonable degree of medical probability, patient's right carpel tunnel syndrome (with negative electrodiagnostic studies) is a result of his prolonged immobilization with zip-tie handcuffs on 12-11-00." At trial, Dr. Diskant testified his subsequent medical research convinced him his panel's conclusion was erroneous and the timing of Plaintiff's symptoms was "coincidental." Dr. Diskant concluded there were no cases of carpel tunnel syndrome found in the medical literature.

35. Ken Williams is qualified to express opinions as an expert in the field of vocational disabilities, including vocational impairment and rehabilitation, the earning potentials of different vocations, and the effect of disability on earnings potential.

36. Plaintiff dropped out of high school in the tenth grade and never obtained a GED. He became a journeyman plumber in 1995. He has also worked as an electrician's helper, a fast food cook, a correctional officer, and a truck driver.

37. Presently, Plaintiff is unable to perform work as a plumber or truck driver due to his ongoing and unresolved medical impairments, and has been working at menial, minimum wage jobs or been unemployed in recent months.

38. Plaintiff allowed his license as a journeyman plumber to lapse prior to December 11, and did not work full time as a plumber in calendar year 2000.

39. Plaintiff obtained a commercial driver's license through the New Mexico Unemployment Division subsequent to his December 11, 2000, injury.

40. Plaintiff obtained employment as a truck driver for Swift Transportation Company, but quit after three months because he could not endure the pain in his arms. He is eligible for rehire at Swift. He also worked briefly as a driver for Albuquerque Moving & Storage, and as a van driver for railroad personnel.

41. Plaintiff has made reasonable efforts to find and maintain employment.

42. **Following the two additional recommended surgeries, medical testimony supports the conclusion Plaintiff is likely to be able to return to work as a journeyman plumber or long haul driver.**

43. **Mr. Williams found that prior to the December 11, 2000, incident, Plaintiff, who was a journeyman plumber, had access to 36.4% of jobs in the New Mexico labor market. After the incident and the resulting injuries, he has access to only 1.3% of jobs in the same market, representing an 85% loss of access to the job market.**

44. **Mr. Williams recognized that one acceptable method to determine lost earnings and lost earning potential is to look at historical earnings before and after the injury.**

45. **Plaintiff's average gross adjusted income for the years 1996 through 2000 was $25,146.00. His income for 2001 and 2002 indicates he earned an average of $11,000 less per year following the injury. Projecting this forward for another four years, he will suffer a loss of future earnings of $44,000.00. Discounting this amount to present value at 1.5%, Plaintiff is entitled to $43,400.00. Along with the $22,600.00 plus interest lost in 2001-2, Plaintiff will have lost $66,000.00 before there is any reasonable chance he can return to work approximating his pre-injury earnings.**

46. **Plaintiff's total medical bills for services necessitated by the December 11, 2000, incident are $15,630.25. His projected future medical costs are in a range of $17,000.00.**

47. **As a proximate result of his handcuffing by Defendant Simmons, Plaintiff has suffered significant, persistent, and almost daily pain since December 11, 2000.**

48. **Plaintiff has suffered significant emotional injury, including depression, as a proximate result of the December 11, 2000, handcuffing.**

.

## Conclusions of Law

1. **This Court has jurisdiction over the parties and the subject matter of this lawsuit, and venue is proper.**

2. **This Court has supplemental jurisdiction over Plaintiff's state law claims.**

*42 U.S.C. § 1983*

3. **Defendant is a "person" within the meaning of 42 U.S.C. § 1983.** *Scott v. Moore*, **114 F.3d 51 (5th Cir. 1997).**

4. **Defendant acted under color of law and his acts and omissions constitute state action under 42 U.S.C. § 1983.** *Brower v. County of Inyo*, **489 U.S. 593 (1989).**

5. **Claims for excessive force are analyzed under a Fourth Amendment, reasonableness, standard.** *Graham v. Connor*, **490 U.S. 386, 394 (1989). "***Graham* **clearly establishes the general proposition that the use of force is contrary to the**

**Fourth Amendment if it is excessive under objective standards of reasonableness."** *Saucier v. Katz*, **533 U.S. 194 (2001).**

6. **The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment.** *Graham*, **490 U.S. at 394;** *Cruz v. City of Laramie*, **239 F.3d 1183 (10th Cir. 2001).**

7. **The use of handcuffs in an unreasonable manner is an excessive use of force,** *Kostrzewa v. City of Troy,* **247 F.3d 633, 639** *(*6th **Cir 2001**), **and something Defendant should have, and did, know about.** *Martin v. Heideman*, **106 F.3d 1308, 1312 (6th Cir. 1997);** *Palmer v. Sanderson*, **9 F.3d 1433 (9th Cir. 1993);** *Lester v. City of Chicago*, **830 F.2d 706, 714 (7th Cir. 1987).** *See also, Lusby v. T.G.& Y. Stores, Inc.,* **749 F.2d 1423 (10th Cir. 1984).**

8. **The** *Graham* **elements weigh in favor of Plaintiff: the crime he was charged with was a petty misdemeanor; he posed no threat to the officers or others, rather he was fully compliant while being handcuffed; and for the duration of his prolonged restraint, he was locked in the back of a small police van. Finally, he neither resisted nor attempted to flee.** *See Hansen v. Black*, **885 F.2d 642, 645 (9th Cir. 1989).**

9. **There were no exigent circumstances to justify Defendant and other APD officers in their refusal to adjust Plaintiff's handcuffs.**

10. **Defendant's conduct was unreasonable and violated Plaintiff's constitutional rights to be free from excessive force.**

11. **Plaintiff is entitled to compensation under 42 U.S.C. § 1983.** *Berry v. City of Muskogee*, **900 F.2d 1489 (10th Cir. 1990).**

12. **Plaintiff is also entitled to an award of attorney's fees and costs.**

*New Mexico Tort Claims Act*

13. **The New Mexico Tort Claims Act recognizes that Defendant had a duty to exercise reasonable and ordinary care while Plaintiff was in his custody to prevent Plaintiff from suffering an injurious battery.** *Methola v. County of Eddy,* **622 P.2d 234 (N.M. 1980);** *Cross v. City of Clovis*, **755 P.2d 589 (N.M. 1988).**

14. **"[W]hen one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody."** *Methola*, **622 P.2d at 238, quoting** *City of Belen v. Harrell*, **603 P.2d 711, 713 (N.M. 1979)**

15. **A battery is a non-consensual physical contact or, in this case, the physical restraint that went beyond what was reasonable and prudent, given the circumstances.**

16. **Although Defendant may have been initially justified in detaining and placing Plaintiff in restraints, he is liable for any subsequent injury inflicted on Plaintiff, if caused by ordinary negligence.**

17. Defendant's conduct on December 11, 2000, did not meet the standard of reasonable or ordinary care, and he negligently caused Plaintiff to suffer unnecessary physical injury.

18. The purpose of compensatory damages is to make Plaintiff whole -- that is, to compensate Plaintiff for the damages he has suffered. He is entitled to compensatory damages for pain and suffering, mental anguish, and discomfort that he has suffered because of Defendant's conduct and the wilful neglect of APD officers at the scene. *Francis v. Johnson*, 471 P.2d 682 (N.M. App. 1970).

19. No evidence of the monetary value of such intangible things as pain and suffering or mental anguish has been, or need be, introduced into evidence. There is no exact standard for fixing the compensation to be awarded for these elements of damage. *Higgins v. Hermes*, 552 P.2d 1227 (N.M. App. 1976).

20. Compensatory damages may only be awarded for injuries that Plaintiff proves were proximately caused by Defendant's allegedly wrongful conduct. Damages will not be awarded for speculative injuries, but only for those injuries which Plaintiff has actually suffered or that Plaintiff is reasonably likely to suffer in the future. *Sanchez v. Martinez*, 653 P.2d 897 (N.M. App. 1982).

21. In fixing an award of damages, drawing reasonable inferences where appropriate from the facts and circumstances in evidence is sufficient to determine compensatory damages. The following elements of damages are allowable:

      **a.**    **Any bodily injury sustained by Plaintiff and any resulting pain, suffering, and mental anguish experienced in the past or to be experienced in the future.** *Baros v. Kazmierczwk*, **362 P.2d 798 (N.M. 1961).**

      **b.**    **Costs of any medical treatment Plaintiff necessarily or reasonably obtained because of the incidents in question.** *Vaca v. Whitaker*, **519 P.2d 315 (N.M. App. 1974).**

      **c.**    **Any loss of income or loss of earning potential. N.M. UJI 13-1803.**

**22.**    **While costs may be recovered under the Tort Claims Act, post-judgment interest is not permitted.** *Kirby v. New Mexico State Highway Dept.,* **643 P.2d 256 (N.M. App. 1982);** *Trujillo v. City of Albuquerque*, **965 P.2d 305 (N.M. 1998)**

**All tendered findings and conclusions not incorporated herein are deemed Denied.**

**Based on the Findings of Fact and Conclusions of Law herein, Plaintiff is awarded judgment in the following amounts:**

    **1.**    **For medical expenses, past and reasonably projected – $32,630.00**

    **2.**    **For lost wages, past and reasonably projected through 2007 – $66,000.00**

    **3.**    **For pain, suffering, and emotional trauma – $95,000.00**

    **4.**    **Plaintiff is further entitled to costs, attorney's fees, and interest on the judgment at a rate of 1.30%.**

A Judgment consistent with these findings of fact and conclusions of law should be drawn up by counsel for Plaintiff and presented to the Court within twenty (20) days.

DATED at Albuquerque this 26th day of February, 2003.

*[signature]*

BRUCE D. BLACK
United States District Judge

**Counsel for Plaintiff:**
David L. Plotsky, Albuquerque, NM

**Counsel for Defendant:**
Jeffrey L. Baker, THE BAKER LAW FIRM, Albuquerque, NM